Abby RABINOWITZ, Plaintiff,

v.

NEW JERSEY STATE BOARD OF EDUCATION: Fred G. Burke, Commissioner of Education of the State of New Jersey; Board of Education of the Borough of Hamburg, Sussex County; Defendants.

Civ. A. No. 81–1226.

United States District Court,
D. New Jersey.

Oct. 29, 1982.

Judith Levin, New York City, for plaintiff.

Irwin I. Kimmelman, Atty. Gen. of N.J. by Jaynee La Vecchia, Deputy Atty. Gen., Trenton, N.J., for defendants New Jersey State Bd. of Educ. and Fred G. Burke.

Joseph M. Hoffman, Newton, N.J., for defendant Bd. of Educ. of the Borough of Hamburg.

## OPINION

SAROKIN, District Judge.

There are few events more tragic than the birth of a physically handicapped or mentally retarded child. To some parents the anguish is even greater than that caused by the death of a child itself.

For centuries the handicapped and retarded have been treated with neglect and too often with abuse. Belatedly such persons have been accorded the respect, dignity and assistance to which they are entitled. Our humanity mandates that they be afforded the opportunity to attain their maximum potential in the same measure that we offer it to the specially gifted child. It is a tribute to our democracy that legislation finally has been enacted to develop the potential of such children.

The federal legislation which is implicated in this action recognizes the needs and rights of the handicapped. This case is before the court because of territorial technicalities of the most tortuous type. The great states of New Jersey and New York each in an outpouring of bureaucratic compassion, have rejected plaintiff's request for an education as provided by the act on the ground that the other is responsible for providing it.

New York insists that New Jersey is responsible because the child has lived here

since shortly after birth;[1] New Jersey insists that New York is responsible because that is where the child's parents live. Each charges that its own rules of eligibility apply. If correct, then the child would be deprived of the educational opportunity the federal law mandates. Obviously, this court will not permit such a result.

For reasons which will be set forth in detail below, the court concludes that the plaintiff's child is entitled to be educated in New Jersey where she has resided her entire life. The suggestion made by the defendants that it is just as convenient for her to be educated in New York ignores the human factors involved and the emotional ties which would be affected by such an upheaval.

The ultimate financial responsibility for such education as between New York and New Jersey is not before the court and need not be resolved in this litigation. A child who is entitled to be educated need not await the end of bureaucratic wrangling in order for such education to commence. If New Jersey is entitled to be reimbursed by New York, that issue can be resolved at a later date in a proceeding to which New York is a party. The battle over the Hudson will have to wait, while the important education of Abby Rabinowitz proceeds.

FACTS

Abby Rabinowitz is an eleven-year old child with Down's Syndrome. She is severely retarded. Her IQ is approximately 20; she weighs approximately 35 pounds; and she has the height of a five or six-year old child. Before entering into the public school system as directed by this court, she was evaluated with the following results: Abby's fine and gross motor activities were extremely limited; she threw and caught a ball in a rudimentary fashion, like an 18 to 24-month old child, and scribbled with a fisted pencil grasp when offered a pencil.

When examined by learning disability experts she had no speech except for a repeated sound of "g-g-g". If given a book to read she held it three to four inches from her face and stared at it cross-eyed. Her eye contact with people was fleeting; she often squinted or averted her gaze when confronted. She frequently grimaced and postured and had a preoccupation with her right hand; and she often stared at the hand, which is palsied, misshapen, and much bigger than the left, as a form of escape and satisfaction. Abby's head is symmetrical and small and is the size of that of a two-year old child.

Abby's parents are Victor and Joanne Rabinowitz. Her father who is 71 and her mother who is 52 live in New York City. Abby's parents provide financial support for her. Abby has one older brother, Mark, who is about 13 years old. Shortly after Abby's birth her parents decided that, in part because of their advanced age, they would not be able to provide Abby with the care she required. They applied to various public and private agencies to obtain lists of persons and institutions with foster home accommodations. After visiting some of the homes and institutions they decided upon one, the home of Mrs. Margaret McVeigh in Elmwood Park, New Jersey. From 1971, when she was two-months old, until 1975, Abby lived with Mrs. McVeigh. In 1975, Mrs. McVeigh moved and decided that she no longer could be a foster parent to Abby. Abby's parents again contacted social agencies to help find Abby a home. Another home was found in New Jersey, this time with Mrs. Virginia Nicolai of Hamburg.

The move from one home to another was traumatic for Abby. She regressed in her ability to communicate with others and there was virtually no sign of her usual cheerful and outgoing disposition. In her

1. Under New York's Education Law, plaintiff would be considered a New Jersey resident: "children cared for in free family homes and children cared for in family homes at board, when such family homes shall be the actual and only residence of such children and when such children are not supported and maintained at the expense of a social services district or of a state department or agency, shall be deemed residents of the school district in which such family home is located." New York's Education Law § 3202(4)(b) (McKinney's 1981).

new home Abby was at first markedly withdrawn and her ability to walk also regressed. The effects of the trauma from the uprooting lasted for about one year.

Abby has now been living with Mrs. Nicolai for over seven years and her progress has been remarkable. When Abby was examined by one expert it was noted that only Mrs. Nicolai could get Abby to perform tasks that she would not perform for others. Mrs. Nicolai has taken a strong yet caring approach in rearing Abby. The child's behavior is imitative of Mrs. Nicolai's. She follows her foster mother around the house, loads and unloads the dishwasher, and feeds herself with a spoon. Abby also dresses herself and can take off her socks and shoes. She uses the sink to wash her hands and sleeps in a crib.

Although Abby has made tremendous progress under the care of Mrs. Nicolai, she is still in need of constant attention. Often Abby eats inappropriate materials, such as draperies, plastic, and twigs, and she is resistive to touching, hugging, and kissing. Mrs. Nicolai scrupulously attends to all of Abby's needs and is one of the few persons who can successfully communicate with the child. It is through Mrs. Nicolai's patience that Abby, however slowly, has progressed.

In 1980, Abby's foster mother and her parents sought to enroll her in a free public education program in Hamburg, New Jersey. The Board of Education of Hamburg denied the child enrollment. In June 1980, Abby, through her father, petitioned the Commissioner of Education of the State of New Jersey for an order enrolling the child as a pupil in the Hamburg schools. The Office of Administrative Law denied plaintiff's request in October 1980. The Administrative Law Judge (ALJ) found that although plaintiff was living in New Jersey for bona fide reasons and not for the purpose of obtaining a free education, she was domiciled in New York where her parents were domiciled and was therefore not entitled to a free public education in New Jersey. After exceptions to the ALJ's decision were filed, the Commissioner of Education, on December 5, 1980, affirmed the ALJ's determination. Plaintiff appealed from the Commissioner's decision to the State Board of Education in January 1981. In April 1981, the Commissioner's decision was affirmed. Suit was subsequently filed in this court. In August 1981, the court issued a preliminary injunction ordering the enrollment of plaintiff in the Hamburg School District for the pendency of this litigation. Plaintiff's parents were required by the order to post bond to cover the costs of the education.

Since Abby has been in school she has made significant and more rapid than usual progress in many areas. She is better at understanding what is said to her and is better at following directions. Her speech potential has also significantly improved and she is finally attempting to talk. Abby's personal hygiene has also progressed: in the last year she has learned to shower herself and dress herself without any assistance. Abby's teachers are very fond of her and they have told Mrs. Nicolai that Abby's development has been noticeable.

The court must now decide whether New Jersey has an obligation to continue to provide Abby with an education. Plaintiff claims that the state, by not providing her with an education, has violated her rights under the Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1401–1461, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the fourteenth amendment to the United States Constitution. Defendants deny that any of plaintiff's statutory or constitutional rights have been violated and assert as a separate defense that abstention by this court would be appropriate because plaintiff has a right of appeal to the Appellate Division of the Superior Court of New Jersey.

DISCUSSION OF THE LAW

The Education of the Handicapped Act, 20 U.S.C. §§ 1400–1461, provides federal money to assist state and local agencies in educating handicapped children. *Board of Education of Hendrick Hudson Central School District v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The

Act is an ambitious congressional attempt to remedy the states' failure to provide appropriate educational services to more than half of the estimated 8 million handicapped children living in the United States at the time of the legislation's enactment. *Id.* 102 S.Ct. at 3037; 20 U.S.C. § 1400(b)(1), (b)(3).

■ Funding under the Act is conditioned upon a state's compliance with the Act's extensive goals and procedures. *Rowley,* 102 S.Ct. at 3037; 20 U.S.C. § 1412. Section 1412 sets forth the eligibility requirements that a state must meet before receiving federal assistance. One prerequisite to such assistance is that "[t]he state [have] in effect a policy that assures *all* handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). (emphasis supplied). Another prerequisite is that the state identify, locate and evaluate "*all* children *residing in the State* who are handicapped . . . ." 20 U.S.C. § 14122(C). (emphasis supplied). This controversy centers on the meaning of these prerequisites.

Plaintiff contends that if a state accepts financial assistance under the Act, it has an obligation to provide a free public education to all handicapped persons within the state's borders. Defendants, on the other hand, contend that the Act was never intended to interfere with existing state laws defining prerequisites for obtaining a free public education within the state. In particular, defendants argue that because Abby is not technically "domiciled" within the state, she is not entitled to be educated here.

New Jersey law defines those persons who are entitled to a free public education in the state:

Public schools shall be free to the following persons over 5 and under 20 years of age:

(a) Any person who is domiciled within the school district;

(b) Any person who is kept in the home of another person domiciled within the school district and is supported by such other person gratis as if he were such other person's own child, upon filing by such other person with the secretary of the board of education of the district, if so required by the board, a sworn statement that he is domiciled within the district and is supporting the child gratis and will assume all personal obligations for the child relative to school requirements and that he intends so to keep and support the child gratuitously for a longer time than merely through the school term . . . .

(c) Any person whose parents or guardian, even though not domiciled within the district, is residing temporarily therein, but any person who has had or shall have his all-year-around dwelling place within the district for 1 year or longer shall be deemed to be domiciled within the district for the purposes of this section;

(d) Any person for whom the bureau of children's services in the department of institutions and agencies is acting as guardian and who is placed in the district by said bureau.

N.J.Stat.Ann. § 18A:38–1 (Supp.1982–83).

The ALJ found that although Abby was brought into the state for personal and family reasons and not to obtain a free education, she was nevertheless not domiciled in New Jersey and therefore was not entitled to a free public school education here. The ALJ's decision was affirmed by the Commissioner of Education and the Commissioner's decision was subsequently affirmed by the State Board of Education. Thus, there has been a complete administrative review of plaintiff's complaint and, defendants' arguments notwithstanding, this court has jurisdiction over the matter. 20 U.S.C. § 1415(e).

■ In determining whether New Jersey has an obligation to provide plaintiff with an education, the court will accept the ALJ's finding that under New Jersey law there is no obligation to educate the child because she is technically domiciled in New York. The court does note, however, that the New Jersey Supreme Court has recog-

nized that the concept of domicile must be applied flexibly case by case to ensure that the right result is accomplished given a certain set of facts. *Worden v. Mercer County Board of Elections,* 61 N.J. 325, 294 A.2d 233 (1972). The court will now consider whether New Jersey law conflicts with the state's obligations as a recipient of funds under the Education for All Handicapped Children Act, 20 U.S.C. § 1400. An analysis of the language of the Act, its legislative history, and the congressional debates preceding its enactment, indicates that under the circumstances of this case, a genuine conflict exists.

In construing a statute, the first obligation of the court is to give effect to the intent of Congress. *United States v. DiSantillo,* 615 F.2d 128, 134 (3d Cir. 1980). Congress expresses its purpose by words. *62 Cases of Jam v. United States,* 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566 (1951). It is the function of the court to faithfully construe what Congress has written and "neither to add nor to subtract, neither to delete nor to distort." *Id.* If the court were to accept defendants' interpretation of the Act, it would be unfaithful to what Congress has unambiguously written. The court can discern no congressional intent to allow a participating state to refuse to educate a handicapped child clearly within its borders for bona fide reasons.

In the Act's declaration of purpose, Congress has unequivocally declared that "It is the purpose of this chapter to assure that *all* handicapped children have available to them ... a free appropriate public education." 20 U.S.C. § 1400(c) (emphasis supplied). Similarly, the eligibility requirements of the Act unambiguously state that funding is conditioned on the state's effectuation of "a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1) (emphasis supplied). The eligibility requirements also unambiguously require as a condition of funding that each state identify, locate and evaluate "*all children residing in the State* who are handicapped." 20 U.S.C. § 1412(2)(C) (emphasis supplied). Nowhere in the wording of these provisions

is there any reference to a child's technical domicile, nor is there any reference to incorporating state law to determine a state's obligations under the Act.

The court notes, however, that where Congress sought to defer to state law it did so clearly and unambiguously. Thus, no state is required to educate "handicapped children aged three to five and aged eighteen to twenty-one inclusive ... if ... such requirements would be inconsistent with state law or practice ... respecting public education within such age groups in the State." 20 U.S.C. § 1412(2)(B). Similarly, the terms "elementary school" and "secondary school" are to be defined using principles of state law. 20 U.S.C. § 1401(9), (10). To read a domicile requirement into the Act would be inconsistent with the statute's plain language. Congress intended that "all" handicapped children within a state would be educated, and, as the Supreme Court has recently noted, this right extends to the handicapped children "within [the state's] borders." *Rowley,* —— U.S. ——, 102 S.Ct. at 3037.

■ Not only does the language of the Act evince a congressional intent to provide an education to all handicapped children situated within a state, but so does the Act's funding mechanism. To determine the amount of money to be awarded to a state meeting its obligations, a formula established by statute must be applied. The grant to which a state is entitled for any fiscal year is equal to "the number of handicapped children aged three to twenty-one, inclusive, *in such State* who are receiving special education and related services" multiplied by a designated percentage of "the average per pupil expenditure in public elementary and secondary schools in the United States." 20 U.S.C. § 1411(a)(1) (emphasis supplied). Allocations are therefore made under the Act not by reference to children domiciled within the state but rather by determining how many children *in the state* are being educated.

The regulations implementing the Act are consistent with this interpretation. The regulations state:

(a) The maximum amount of the grant to which a State is entitled under section 611 of the Act in any fiscal year is equal to the number of handicapped children aged three through 21 *in the State* who are receiving special education and related services, multiplied by the applicable percentage, under paragraph (b) of this section, of the average per pupil expenditure in public elementary and secondary schools in the United States.

34 C.F.R. § 300.701 (emphasis supplied).

In an analogous context, the appendix to the federal regulations defines the word "in":

Under § 104.33(a), a recipient is responsible for providing a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction. *The word "in" encompasses the concepts of both domicile and actual residence.* If a recipient places a child in a program other than its own, it remains financially responsible for the child, whether or not the other program is operated by another recipient or educational agency. Moreover, a recipient may not place a child in a program that is inappropriate or that otherwise violates the requirements of Subpart D. *And in no case may a recipient refuse to provide services to a handicapped child in its jurisdiction because of another person's or entity's failure to assume financial responsibility.*

34 C.F.R. § 104, App. A, n. 23.

■ Thus, under the regulations, while domicile might play a role in determining a recipient state's obligations where it sends a child into another jurisdiction to be educated, it plays no role where, as here, no state has assumed the responsibility for providing an education to a handicapped person who has resided for all but the first two months of her life within New Jersey's borders. Under these circumstances, the state, at minimum, has an obligation to provide the child with an education.

Additional support for this position comes from the regulations' definition of "parent". The regulations implementing the procedural safeguards of the Act state:

As used in this part, the term "parent" means a parent, a guardian, a person acting as a parent of a child, or a surrogate parent who has been appointed in accordance with § 300.514. The term does not include the State if the child is a ward of the state.

34 C.F.R. § 300.10.

The comment to the regulation then declares:

The term "parent" is defined to include persons *acting in the place of a parent,* such as a grandmother or stepparent with whom a child lives, *as well as persons who are legally responsible for a child's welfare.*

The regulations themselves, therefore, recognize that a handicapped individual might be living with a person other than her real parents or a legally appointed guardian, and they make provision for such persons to safeguard the procedural rights of the handicapped child for whom they are responsible.

■ Although the regulations implementing the Act provide substantial guidance in ascertaining Congress' intent, *Ford Motor Credit Co. v. Cenance,* 452 U.S. 155, 158 n. 3, 101 S.Ct. 2239, 2241 n. 3, 68 L.Ed.2d 744 (1981), so too does the Act's legislative history. At the time of the statute's enactment, Congress regarded the failure to provide an education to handicapped children as a problem of national dimension. The Act's history states:

This Nation has long embraced a philosophy that the right to a free appropriate public education is basic to equal opportunity and is vital to secure the future and the prosperity of our people. It is contradictory to that philosophy when that right is not assured equally to all groups of people within the Nation. Certainly the failure to provide a right to education to handicapped children cannot be allowed to continue.

S.Rep.No. 168, 94th Cong. 1st Sess., reprinted in [1975] U.S.Code Cong. & Admin.News 1425, 1433. [hereinafter Senate Report].

The history also states:

Thus, the Committee bill requires that the State have in effect a policy that assures *all* handicapped children the right to a free appropriate public education. *Id.* at 1440 (emphasis supplied).

The legislative debates also underscore Congress' belief that the failure to educate the handicapped was a problem of national proportions. Representative Brademas noted:

> There are over 8 million handicapped children in the United States and only 3.9 million are currently receiving an appropriate education; 1.75 million handicapped youngsters are receiving no education at all; and 2.5 million children are receiving an inappropriate education.

121 Cong.Rec. 23702.

Similarly, Senator Humphrey observed the severity of the problem:

> There is no reason why educational opportunity should not be extended to *all* our children. As a matter of fact, by depriving an individual of such opportunity, society itself suffers. In the case of the handicapped child, our failure to stimulate his or her potential can only lead to despair and dependence on the part of the handicapped individual, and this dependence will inevitably be funded by the *American public.*

*Id.* at 19505. (emphasis supplied).

Representative Minish also noted that it was important to educate the handicapped so that they would become productive members of society:

> Through the provision of appropriate educational services many of these individuals will be able to become contributing members of our society, and will not have to rely upon subsistence payments from public funds.

*Id.* at 23709.

■ The Act was not only designed to make handicapped persons productive members of society but it was also intended to relieve families of the strains attendant to providing an education. As Senator Mondale noted: "We must relieve the emotional and financial burdens placed on families

with handicapped youngsters." *Id.* at 19505.

That Congress recognized that the education of the handicapped was of national importance is confirmed by the statement of findings in the first section of the Act. The findings state that there are more than 8 million handicapped children in the United States, 20 U.S.C. § 1400(b)(1), that these children's special needs are not being met, *id.* § 1400(b)(2), that more than half of the children in the country are not receiving appropriate educational services, *id.* § 1400(b)(3), that one million handicapped children have been excluded from the nation's schools, *id.* § 1400(b)(4), that regular school programs have often failed to detect the existence of enrolled children's handicaps, *id.* § 1400(b)(5), that the lack of adequate services has forced families to educate their children at great distances from their homes, *id.* § 1400(b)(6), that funding will assist States in educating the handicapped, *id.* § 1400(b)(7), that "State and local educational agencies have a responsibility to provide education for *all* handicapped children, but [that] present financial resources are inadequate...," *id.* § 1400(b)(8), and finally that "it is in the *national interest* that the Federal Government assist State and local efforts" to provide programs to assure handicapped children of the equal protection of the law. *Id.* § 1400(b)(9). (emphasis supplied).

Immediately following the statement of findings, the purpose of the Act is set forth:

> It is the purpose of this chapter to assure that *all* handicapped children have available to them ... a *free* appropriate public education ....

*Id.* § 1400(c).

Citing *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), defendants urge that Congress did not condition funding under the Act on the states' abandonment of their domiciliary requirements. Defendants are mistaken. In *Pennhurst,* a class of institutionalized mentally retarded citizens brought suit under the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. § 6000 *et seq.* The plain-

tiffs claimed that the Act created judicially enforceable substantive rights and that conditions at the Pennhurst State School and Hospital violated those rights. The Supreme Court held that because Congress did not explicitly condition state funding on the state's acceptance of the Bill of Rights under the Act, no affirmative obligations were placed on the states:

> The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract'. There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it. *Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.*

*Id.* at 17, 101 S.Ct. at 1539–1540. (citations omitted) (emphasis supplied).

This case is distinguishable from *Pennhurst* because here Congress has explicitly and unequivocally conditioned funding on the states' acceptance of certain affirmative obligations. Those obligations are set forth in Section 1412 of the Act, which declares:

> In order to qualify for assistance under this subchapter in any fiscal year, a State shall demonstrate to the Commissioner *that the following conditions are met:*
>
> (1) The State has in effect a policy that assures *all* handicapped children the right to a free appropriate public education.
>
> \*   \*   \*   \*   \*   \*
>
> (2) The State has developed a plan . . . to assure that . . . .
>
> (C) *all children residing in the State* who are handicapped . . . are identified, located, and evaluated. . . . .

The will of the Congress could not have been more clearly expressed: if states are to accept funding under the Act, then they have an obligation to educate the handicapped children "within [their] borders." *Rowley,* —— U.S. ——, 102 S.Ct. at 3037.

■ To the extent that state law conflicts with a state's obligations under federal law, the federal law governs. *King v. Smith,* 392 U.S. 309, 333 and n. 34, 88 S.Ct. 2128, 2141 and n. 34, 20 L.Ed.2d 1118 (1968).

In *Battle v. Commonwealth of Pennsylvania,* 629 F.2d 269 (3d Cir.1980), *cert. denied,* 452 U.S. 968, 101 S.Ct. 3123, 69 L.Ed.2d 981 (1981), the Third Circuit held that Pennsylvania's administrative policy, which set a limit of 180 days of instruction per year for all children, handicapped or not, interfered with plaintiffs' rights to obtain a "free appropriate education" under the Education for All Handicapped Children Act, 20 U.S.C. §§ 1401–1420 (1976). The Court stated:

> We therefore conclude that inflexible application of a 180 day maximum prevents the proper formulation of appropriate educational goals for individual members of the plaintiff class.

*Battle,* 629 F.2d at 280.

The Court thus focused on the Act's emphasis on individual self-sufficiency in reaching its conclusion. It also recognized, however, the extent of the state's obligations under the Act:

> [E]very state which elects to receive federal assistance under the Act [must] provide *all* handicapped children with the right to a 'free appropriate public education.'

*Id.* at 270. (emphasis supplied).

Recently, in *Board of Education of the Hendrick Hudson Central School District v. Rowley,* —— U.S. ——, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982), the Supreme Court held that although states participating under the Act had an obligation to provide handicapped children with a free appropriate public education, they did not have an obligation to "maximize each handicapped child's potential." *Id.* at 3047. The Court did find, however, that each participating state had an obligation under the Act to educate the handicapped children "within its borders", and that the program provided to the handicapped must be "reasonably calculated to enable [them] to receive educational benefits. *Id.* at 3051. The Court thus recognized that a "free appropriate education" was an explicit condition of funding. In fact, the Court stressed that the "'basic floor of opportunity' provided by the Act consists of *access to specialized instruction." Id.* at 3048. (emphasis supplied).

Here, all that is sought by plaintiff is what the Supreme Court recognized that the Act required: access to an education. The court therefore holds that under these circumstances, where a handicapped child has been living in the state since she was two months old, and where the reasons for her being placed here were bona fide and not for purposes of obtaining a free education,[2] and where to uproot her would be traumatic and dysfunctional, then the state has an obligation to provide the child with a free appropriate education pursuant to the dictates of the Act. Whether New Jersey is entitled to be reimbursed by New York for the cost of the education is not before the court. Instead, the court only decides that New Jersey has an obligation for providing the education.[3] It is inconceivable that Congress would have intended any other result.

To find for defendants would require the child either to continue to live in New Jersey and travel to New York or move permanently to New York.[4] The court rejects both of those alternatives. The Act is aimed at lowering the barriers over which the handicapped must hurdle, not raising them. They may not run with the speed of others, but government should generate a wind from behind which propels them forward, and not one from in front which impedes their progress.

Accordingly, judgment is entered in favor of the plaintiff and against the defendants. Counsel for plaintiff shall submit an appropriate form of order in accordance with the Opinion.

---

**2.** The finding that the child was sent into the state not for the purposes of receiving an education but rather for legitimate family reasons distinguishes this case from those where parents unilaterally selected an institution for their child. *See, e.g., Stemple v. Board of Education of Prince George's County,* 623 F.2d 893 (4th Cir.1980), *cert. denied,* 450 U.S. 911, 101 S.Ct. 1348, 67 L.Ed.2d 334 (1981). The court has no disagreement with the principle that a parent may not select an institution for a handicapped child without first obtaining state approval. *See, e.g., Vander Malle v. Ambach,* 673 F.2d 49, 52 (2d Cir.1982).

**3.** Recently, in *Plyler v. Doe,* —— U.S. ——, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), the Supreme Court held that a Texas statute, which discriminated between aliens and citizens of this country in determining a child's residence for purposes of education, violated the equal protection clause of the United States Constitution. In a footnote of the opinion the Court stated:

Appellants have not shown that the families of undocumented children do not comply with the established standards which the State historically tests residence. Apart from the alienage limitation, § 21.031(b) requires a county to provide education only to resident children. *The counties of the State are as free to apply to undocumented children established criteria for determining residence as they are to apply those criteria to any other child who seeks admission.*

*Id.* at 2400 n. 22. (emphasis supplied).

Defendants argue that in the above-quoted language the Court was recognizing the legitimacy of traditional state residency requirements. Defendants misconceive, however, *Plyler's* relevance to this case. The issue here is not equal protection. Instead, it is whether under a funding statute, which is in the nature of a contract, *cf. Pennhurst State School v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539–40, 67 L.Ed.2d 694 (1981), the State has agreed to undertake certain affirmative obligations in exchange for federal monies. Here the state has done so because participation under the Act requires the state to educate "*all* handicapped children." 20 U.S.C. § 1412(1) (emphasis supplied).

**4.** In the statement of findings set forth in the first section of the Act Congress specifically notes that the Act was intended to remedy the need for handicapped children to travel long distances from their homes in order to obtain an education. 20 U.S.C. § 1400(b)(6).