283 N.J. Super. 505 (1995)
662 A.2d 976
ROXBURY TOWNSHIP BOARD OF EDUCATION, PLAINTIFF-RESPONDENT,
v.
WEST MILFORD BOARD OF EDUCATION, DEFENDANT-APPELLANT, AND WALLINGTON BOARD OF EDUCATION, AND D.Y. AND S.K., AS THE PARENTS OF J.K., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 13, 1995.
Decided July 31, 1995.
*511 Before Judges STERN, KEEFE and HUMPHREYS.
James S. Rothschild argued the cause for appellant (Riker, Danzig, Scherer, Hyland & Perretti, attorneys).
Linda J. Robinson argued the cause for respondents D.Y. and S.K. (Herbert D. Hinkle, attorney).
David B. Rand argued the cause for respondent Roxbury Township Board of Education (Rand, Algeier, Tosti & Woodruff, attorneys; Deborah A. White, on the brief).
Walter M. Slomienski, Jr. argued the cause for respondent Wallington Board of Education.
Geraldine Callahan, Deputy Attorney General, argued the cause for Amicus Curiae Commissioner of Department of Education (Deborah Poritz, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by KEEFE, J.A.D.
The West Milford Board of Education (West Milford) appeals from a final judgment entered by Judge Reginald Stanton providing, inter alia, that, as of January 1, 1993, West Milford was the district of residency of J.K., an autistic child, and as such, it was responsible for the cost of J.K.'s education at Heartspring Lifeskills Learning Center (Heartspring), the development of an Individualized Education Plan (IEP), and related determinations concerning J.K.'s appropriate educational placement pursuant to State and Federal law. West Milford also appeals from a subsequent judgment entered by Judge Stanton assessing counsel fees against it and in favor of J.K.'s parents in the amount of $15,717.20. In its original appellate brief West Milford presented the following issues for resolution:

*512 POINT I THE TRIAL COURT'S DECISION THAT WEST MILFORD IS THE DISTRICT OF FINANCIAL RESPONSIBILITY FOR J.K.'s EDUCATION AT HEARTSPRING IS ERRONEOUS
A. The Trial Court Failed To Apply Pertinent Statutes and Regulations In Determining J.K.'s School District For School Funding Purposes
B. Judge Stanton's Failure To Follow This Statutory Scheme Set Forth In N.J.S.A. 18A:7B-12 Resulted In Great Inequities To West Milford
C. The Office Of Administrative Law's Actions In This Matter Were Those Of A "State Agency"
D. The Trial Court's Determination Of J.K.'s Domicile In West Milford Township Was Counter To Existing Case Law
POINT II THE TRIAL COURT ERRONEOUSLY AWARDED ATTORNEY'S FEES TO J.K.'s PARENTS UNDER 20 U.S.C.A. § 1415(e)(4)(B)
A. The Trial Court Failed To "Balance the Equities" In Ordering That West Milford Pay J.K.'s Parents' Attorneys Fees
POINT III THE TRIAL COURT ERRED IN FAILING TO ORDER AN ACCOUNTING AND THE TURNOVER OF FUNDS AWARDED TO WALLINGTON TO WEST MILFORD
At initial oral argument before us on April 11, 1995, West Milford argued for the first time that the Law Division lacked subject matter jurisdiction to enter the judgments under review. In view of the well established principle that "jurisdiction over the subject matter cannot be waived or conferred by consent or lack of objection thereto[,]" McKeeby v. Arthur, 7 N.J. 174, 81 A.2d 1 (1951), we asked for supplemental briefs on the issue, and invited the participation of the Commissioner of Education (Commissioner) as an amicus curiae. For the reasons stated herein, we reject West Milford's contention that the Law Division lacked subject matter jurisdiction, and also affirm on the merits of the judgments under review.
The facts necessary to understand the issues advanced by the parties are essentially undisputed. In 1989, J.K., an autistic child, and his parents lived in Wallington, New Jersey. In August of that year an Administrative Law Judge (ALJ) determined that the appropriate placement for J.K. was at Heartspring. The proceedings before the ALJ were brought pursuant to the Education For All Handicapped Children Act of 1975, 20 U.S.C.A. § 1401-61, now known as the Individuals with Disabilities Education Act, and referred to herein as the IDEA. In accordance with the ALJ's *513 order, which was final pursuant to 20 U.S.C.A. § 1415(e), the Wallington Board of Education (Wallington) placed J.K. in Heartspring and assumed the costs for that placement, including the obligation to provide other benefits guaranteed J.K. by the IDEA.
In December 1990, J.K.'s parents divorced. In the divorce decree, his parents were granted joint custody. S.K., J.K.'s father, maintained physical custody and remained in Wallington until December 1992, when he moved to Roxbury Township. Meanwhile, J.K.'s mother, D.Y., remarried and moved to West Milford in 1991.
On December 21, 1992, S.K. executed a certification consenting to the transfer of J.K.'s physical custody to D.Y. On December 17, 1992, S.K. advised the Superintendent of Schools of West Milford that D.Y. had custody of J.K. and he now resided with her in West Milford. S.K. and D.Y. executed a Student Transfer Card indicating that J.K. was being transferred from Wallington to West Milford. The expressed reasons for the transfer of physical custody were that J.K.'s mother now had a home rather than an apartment; her marriage permitted her to remain home during the day; and J.K.'s father had a job with the potential for relocation outside the State of New Jersey. J.K.'s parents believed that the transfer would give stability to J.K. and was in his best interests.
In a letter dated January 4, 1993, Howard B. Heller, Director of Special Services for West Milford, wrote to D.Y. on behalf of West Milford expressing "sincere reservations as to [J.K.'s] domicile in West Milford[,]" and advised her that West Milford's position was that "the new resident district of the father" or DYFS had the responsibility for tuition payments. He further advised D.Y. that, as a result of a visit by the West Milford Child Study Team, "there exists some question on behalf of the West Milford School District as to the continued necessity for a residential school placement for [J.K.] in order to meet his educational needs. *514 Certainly, [J.K.'s] current residential school placement in Kansas is in question."
J.K.'s parents, through their attorney, advised the Department of Education (Department) that West Milford refused to accept responsibility for J.K.'s education and asked the Department either to enforce the ALJ's 1989 decision, or to act on an emergent basis because termination of J.K.'s educational placement was imminent. The Department advised the parents' attorney that the request for emergent relief was procedurally deficient because it was not accompanied by a certification. The procedural deficiency was corrected in a new application filed with the Department on February 22, 1993.
On February 23, 1993, the Department's due process mediator for the Division of Special Education forwarded the parents' request for emergent relief to the Office of Administrative Law (OAL) for a hearing. The emergent nature of the parents' application was withdrawn when, at the request of the ALJ (not the one who rendered the 1989 decision), the parents reached an agreement with Heartspring to withhold its demand for payment pending the outcome of the ALJ's decision. Wallington was joined as a party by consent, and a plenary hearing was conducted.
In his June 10, 1993, written decision, the ALJ concluded that Wallington's obligation to pay expired as of December 31, 1992, and that West Milford and Roxbury should share the cost for the remainder of the 1992-93 school year. In a footnote, the ALJ rejected West Milford's argument that the State Facilities Education Act, N.J.S.A. 18A:7-12(b), applied in this context. West Milford had contended that J.K. was placed at Heartspring by a State agency because the first ALJ had entered the order, and as such, the statute required the district of the parent with whom the child lived prior to his most recent placement (Wallington) to bear the cost of J.K.'s education.
The ALJ further ordered the parents to seek modification of the divorce decree so that a singular residence for J.K. could be *515 established. The ALJ's opinion reflected his belief that his jurisdiction was conferred by the provisions of the IDEA inasmuch as he concluded the decision with the following statement: "This decision is final pursuant to 20 U.S.C.A. § 1415(e) and 34 C.F.R. § 300.509 (1986) and is appealable for filing a complaint and bringing a civil action either in the Superior Court of New Jersey or in a District Court of the United States. 20 U.S.C.A. § 1415(e)2, 34 C.F.R. § 300.511."
Roxbury appealed the ALJ's decision by filing a complaint in the Law Division. Roxbury invoked the jurisdiction of the Law Division pursuant to the provisions of the IDEA, 20 U.S.C.A. § 1415(e)(2), and N.J.A.C. 1:6A-18.3(a). West Milford filed an answer, counterclaim and cross-claim. In its answer, it admitted the allegations under which Roxbury invoked the jurisdiction of the Law Division. The defense of subject matter jurisdiction was not asserted.
As noted at the outset of this opinion, after receiving briefs from the parties and entertaining oral argument, Judge Stanton held that West Milford was responsible for J.K.'s education and residential costs at Heartspring, as well as other responsibilities flowing from the IDEA. Subsequently, as a result of the motion brought by J.K.'s parents, Judge Stanton assessed counsel fees against West Milford in the amount of $15,000. This appeal followed.

I
The IDEA guarantees the parents of a child with disabilities the right to "present complaints with respect to any matter relating to the ... educational placement of the child, or the provision of a free appropriate education to such child." 20 U.S.C.A. § 1415(b)(1)(E); N.J.A.C. 6:28-2.7. Heller's letter to J.K.'s parents denied their request for payment of J.K.'s residential placement and also questioned the appropriateness of his placement. Clearly, a dispute within the context of the IDEA was thereby created. Our Supreme Court has stated that when such a *516 dispute arises "between the board and the parents, either party has the right to resolve the matter through an administrative proceeding known as an `impartial due process hearing.'" Lascari v. Board of Educ., 116 N.J. 30, 37, 560 A.2d 1180 (1989) (quoting 20 U.S.C.A. § 1415(b)(2)). That is exactly what J.K.'s parents did in this matter. Upon receipt of the parents' request for a due process hearing, the Department treated the matter procedurally as a contested case under the IDEA and relevant administrative regulations.
At oral argument before us, West Milford and the Commissioner conceded that the parents' initial application for relief invoked the jurisdiction of the IDEA, and the matter was referred to the OAL on that basis. However, much has been made of the fact that the parents subsequently withdrew their request for emergent relief, and, thereafter, participated in a plenary hearing before the ALJ on the issue of which board or boards was or were responsible for the payment of J.K.'s placement costs. The suggestion is that somehow the dispute was transformed from one within the purview of the IDEA into one simply arising "under the school laws" and, consequently, within the jurisdiction of the Commissioner to resolve. N.J.S.A. 18A:6-9. As we read the regulations pertinent to this matter, only the settlement of the dispute would have removed the matter from the ALJ's "due process" jurisdiction. See N.J.A.C. 1:6A-4.2.
However, there was no settlement of the matter. The parents withdrew their request for emergent relief only because Heartspring agreed not to discharge J.K. for non-payment pending the outcome of the OAL hearing. We see nothing in the record before the ALJ wherein West Milford agreed to pay J.K.'s placement costs if it lost, nor did it withdraw that portion of Heller's letter which questioned the appropriateness of J.K.'s placement. If West Milford desired to relieve J.K.'s parents of the financial burden of participating in the OAL hearing, it could have stipulated that J.K.'s placement costs would be paid, with the question of allocation between the boards to await the outcome of a *517 contested case hearing before the Commissioner, and it could have withdrawn that portion of its January 4, 1993, letter in which it questioned the appropriateness of J.K.'s residential placement. That was not done, and, thus, we find nothing in the record that relieved the parents of the challenge presented to them by West Milford's letter.
Even if the only issue remaining before the ALJ was the question of which board(s) was (were) financially responsible, that issue by itself is sufficient to invoke the jurisdiction of the IDEA. Rabinowitz v. New Jersey State Bd. of Educ., 550 F. Supp. 481 (D.N.J. 1982).[1] While the issue of domicile may be a relevant factor between competing school districts as to which district shall be obligated to expend the funds necessary to comply with the IDEA, that issue is a matter of local law, and should not impact on an otherwise qualified child from receiving the free education that the statute mandates. As Judge Sarokin aptly noted, "[n]owhere in the wording of these provisions is there any reference to a child's technical domicile, nor is there any reference to incorporating state law to determine a state's obligations under the Act.... To read a domicile requirement into the Act would be inconsistent with the statute's plain language." Id. at 486.
Thus, if, as West Milford and the Commissioner contend, no dispute existed as to J.K.'s entitlement to residential placement, payment should have been guaranteed at the outset, and *518 J.K.'s parents should have been relieved of the burden of litigating the issue of who pays. Just as the IDEA does not base its determination of a handicapped child's rights on domicile, the same child's rights do not hinge on arrangements with respect to custody or how such arrangements may impact on residence and domicile. Here J.K. was denied the fundamental right of a free education guaranteed by the IDEA, and his parents were compelled to litigate an issue all parties now seem to say the parents never should have been required to litigate. That realization comes after the fact, and much too late. The point to be made is that J.K.'s parents were not given the peace of mind the Federal statute intended them to have. Without such assurances, the IDEA mandates their access to the procedural forum designed to guarantee the vindication of those rights. Until Judge Stanton, pursuant to the jurisdiction conferred upon him by the IDEA, ordered West Milford to provide J.K. with funding and special education services, no school district provided him with the benefits conferred by the IDEA, notwithstanding the fact that neither Roxbury nor West Milford sought a stay of the ALJ's final decision.
The fact that Judge Stanton had to decide a State law issue, i.e. domicile, in order to resolve the contest concerning responsibility for payment is of no moment. We must assume that the manner in which New Jersey chooses to implement the IDEA does not violate federal law. As such, the actual burden of paying the costs of a disabled child's education under the IDEA is placed by State law on the individual school districts, who, in turn, receive funding from the State. While the intricacies of State law cannot interfere with a person's right to receive the benefits of the federal statute, id. at 489, in the context of this litigation it was imperative to resolve the domicile issue in order to vindicate the larger federally granted right of a free education. There is no justification for fractionalizing that issue by sending it to the Commissioner for disposition.
*519 We are also unpersuaded by the argument that somehow subject matter jurisdiction may have been lost because the ALJ failed to send the matter back to the Department for a conference after the request for emergent relief was withdrawn. "The purpose of the conference is to assist the parties in defining issues, identifying evidence, exchanging facts, stipulating facts and listing possible witnesses. Mediation will be available at the conference if both parties agree to participate." N.J.A.C. 6:28-2.7(d)4i. A conference may also result in settlement. However, if it is not settled, the matter will be transmitted to the OAL. Id. at iv and vi.
No party takes the position here that the matter would have been settled if it had been sent back to the Department for a conference. As indicated earlier, once the parents invoked the jurisdiction of the IDEA, no one could have deprived them of access to the forum guaranteed to them under the statute, short of a settlement in which J.K.'s full federally granted rights would have been guaranteed. As to the other expressed purposes of the conference, it is clear from the ALJ's opinion that the issue was agreed upon and was simple. The only disagreement was the application of the facts to the principles of law that governed the issue of domicile. The ALJ's error in not following the procedure established by the regulations is clear. However, it was not so egregious as to deprive him of subject matter jurisdiction. We assume the Department did not think so either, inasmuch as it raised no objection when it received a copy of the ALJ's opinion.
Even if we were to assume that no IDEA issue was implicated by the parties' dispute, we hold that the Law Division, nonetheless, had jurisdiction to decide the matter. "[E]xcept in those cases where the legislature vests exclusive primary jurisdiction in an agency, a plaintiff may seek relief in our trial courts." Abbott v. Burke, 100 N.J. 269, 297, 495 A.2d 376 (1985). The Legislature did not give the Commissioner of Education exclusive jurisdiction in "controversies and disputes under the school laws." N.J.S.A. 18A:6-9. Rather, as the Court observed in Abbott, "when *520 a controversy arises in the field of education, the cases tend to determine remedies by a procedural course set by N.J.S.A. 18A:6-9." Abbott, supra, 100 N.J. at 301, 495 A.2d 376. Therefore, the issue now presented, properly framed, is whether the parties should be required to exhaust their administrative remedy. Id. at 297, 495 A.2d 376.
Exhaustion of administrative remedies is not compelled in all cases involving disputes arising under school laws. Durgin v. Brown, 37 N.J. 189, 202-203, 180 A.2d 136 (1962). Generally speaking, cases involving only questions of law do not require the exhaustion of administrative remedies. Abbott, supra, 100 N.J. at 298, 495 A.2d 376. An exception to that rule occurs when the resolution of the legal or constitutional issues is particularly fact sensitive and may be facilitated through the use of agency expertise. Id. at 299-301, 495 A.2d 376. The question of where a person is domiciled is fact sensitive, but it is the kind of issue that courts have routinely resolved. See Citizens Bank & Trust Co. v. Glaser, 70 N.J. 72, 357 A.2d 753 (1976); Lea v. Lea, 18 N.J. 1, 112 A.2d 540 (1955); Mansfield Tp. Bd. of Educ. v. State Bd. of Educ., 101 N.J.L. 474, 480, 129 A. 765 (E & A 1925); Edwards v. Edwards, 8 N.J. Super. 547, 551, 73 A.2d 759 (Ch.Div. 1950). No agency expertise is required to make the appropriate analysis. Neither West Milford nor the Commissioner has been able to articulate any distinction between considerations for determining domicile under N.J.S.A. 18A:38-1, as opposed to those used in determining domicile for other purposes. Knowing the questions before us, the Commissioner had the opportunity both to suggest the disposition on the merits if we disagreed with his contention concerning subject matter jurisdiction, or to seek the opportunity to file a further brief on the merits if we disagreed with his jurisdictional contention. The Commissioner did neither. In any event, we do not believe the unique circumstances of this case will constitute such precedent so as to deprive the Commissioner of an opportunity to be heard in the future or to convince a court that we may have overlooked something significant in this case. If we *521 have, it is because none of the parties, including the Commissioner as amicus, have called it to our attention.
We do not disagree with the Commissioner's statement in his brief that he has both the jurisdiction and the responsibility to determine which school district has the responsibility to bear the expense of the free, appropriate education granted for disabled children. However, if he wishes to obtain primary jurisdiction, some mechanism must be adopted to assure the parents of otherwise qualified children that both payment and services under the IDEA will continue uninterrupted where the only question is who is ultimately responsible for payment. We doubt that such a remedy can be implemented on a case by case basis, and, thus, a remand to the Commissioner would accomplish nothing with respect of the funding issue. Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 328-337, 478 A.2d 742 (1984).
Other arguments advanced by West Milford and the Commissioner on the issue of the Law Division's jurisdiction do not warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

II
In his bench opinion of January 10, 1994, Judge Stanton agreed with the ALJ that J.K. had not been placed in Heartspring by a State agency, thereby rejecting West Milford's argument that N.J.S.A. 18A:7B-12(b) placed the obligation of J.K.'s educational costs on Wallington, and, by analogy, his residential costs as well. However, Judge Stanton disagreed with the ALJ's resolution of the domicile issue. He held that the parents were perfectly capable of coming to an agreement as to J.K's physical custody without court approval. He also disagreed with the ALJ's conclusion that a person can have more than one domicile. See In re Gillmore's Estate, 101 N.J. Super. 77, 243 A.2d 263 (App.Div.), certif. denied, 52 N.J. 175, 244 A.2d 304 (1968). Judge Stanton held that a child of a divorced couple, such as J.K., is domiciled where the parent the child lives with is domiciled, in *522 this case his mother in West Milford. See Edwards, supra, 8 N.J. Super. at 550-551, 73 A.2d 759 (noting that child living with mother takes mother's domicile if parents are divorced or legally separated). Consequently, the responsibility for J.K.'s education, like that of any child who changes school districts during a school year, is placed with the district where the parent with whom the child resides moved. N.J.S.A. 18A:38-1(a); N.J.A.C. 6:20-1.2(e).
In order to prevent parents from randomly switching school districts in such situations, the judge held that divorced parents had to have a united intent to establish a district as their child's district, and their decision would be determinative if reasonable and based on good faith considerations. Given that criteria, Judge Stanton found that J.K.'s mother had established West Milford as her home; J.K. had his room and furniture there; J.K.'s parents intended West Milford to be his residence; and J.K.'s mother and her new husband intended J.K. to live in West Milford should he no longer require a residential placement. Judge Stanton determined that the parents' decision was reasonable and made in good faith, and concluded that J.K. was a resident and member of the West Milford School District from December 21, 1992, the date J.K.'s parents decided to transfer physical custody to the mother. Thus, Judge Stanton imposed upon West Milford the obligation to pay J.K.'s education and residential costs for the second half of the 1992-93 school term as well as a duty to fulfill the other obligations of the IDEA.
Subsequently, J.K.'s parents moved for attorney fees pursuant to the IDEA. While West Milford did not then raise the question of whether Judge Stanton had subject matter jurisdiction to decide the issue, it contended that the issue before the ALJ was essentially an education law issue concerning the child's domicile, and, as such, was resolved solely upon the application of State law principles without the need to invoke legal rights flowing from the IDEA. Judge Stanton concluded that, although domicile was a focal issue in the resolution of the case, the IDEA was fundamentally implicated because West Milford refused to fund J.K.'s *523 education costs attributable to his disability. It was the nature of J.K.'s disability and the tremendous costs associated with it that prompted West Milford's legal position.
[T]he whole question wouldn't have arisen if he, in the first place, weren't such an expensive child and in second place the nature of his disability was not such that he was physically present in a residential institution outside the geographical boundaries of the  of the school district.
Because the proceedings before the ALJ were essentially rooted in the IDEA, Judge Stanton found that it was Congress' intent, expressed in 20 U.S.C.A. § 1415(e)(4)(B), to award counsel fees to parents who prevail in such litigation. See Barlow-Gresham Union High Sch. Dist. v. Mitchell, 940 F.2d 1280, 1286 (9th Cir.1991) (Attorneys fees meet goal of IDEA because they reward parents for using the procedural mechanisms that IDEA has established to ensure the rights of children with disabilities to a free, public education.). Consequently, he assessed counsel fees against West Milford in the amount of $15,717.20.
We have reviewed the record in light of the contentions presented and conclude that Judge Stanton's findings of fact are amply supported by the record, and that he applied correct principles of law to those facts in arriving at his judgment on the issue of domicile, and the parents' entitlement to counsel fees under the IDEA. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974). The issues presented on appeal concerning the merits of the judgments under review do not warrant discussion in a separate opinion. Thus, we affirm the judgments under review substantially for the reasons stated by Judge Stanton in his bench opinions of January 10, 1994, and March 18, 1994, respectively. R. 2:11-3(e)(1)(A), (E).
Affirmed.
NOTES
[1] To the extent that the dicta in A.A. on Behalf of A.A. v. Cooperman, 218 N.J. Super. 32, 38, 526 A.2d 1103 (App.Div. 1987) can be read to indicate that the ALJ is without jurisdiction under the IDEA to resolve a dispute where a school district declines to pay for a free education to which the disabled child is otherwise entitled, we respectfully disagree.

Likewise, L.P. v. Edison Bd. of Educ., 265 N.J. Super. 266, 626 A.2d 473 (Law Div. 1993) is factually distinguishable. In that case, the ALJ attempted to join State agencies as parties in a due process hearing who neither received funds under the IDEA nor were charged with the responsibility of providing a free and appropriate education to disabled children. The case does not stand for the proposition that IDEA jurisdiction is not invoked where the sole issue is the school district's responsibility to pay.