463 P.2d 71

Michael J. BROWN, Appellant and
Cross-Appellee,

v.

Joan M. BROWN, Appellee and
Cross-Appellant.

No. 9837.

Supreme Court of Arizona.

In Banc.

Dec. 26, 1969.

Rehearing Denied Feb. 10, 1970.

Rees, Estes & Browning, Chandler, Tullar, Udall & Richmond, by Donald Estes, Tucson, for appellant and cross-appellee.

John William Johnson, Tucson, for appellee and cross-appellant.

McFARLAND, Justice:

On November 25, 1964, after a trial on the issues, the parties were divorced, and custody of the minor child of the marriage, Kevin Sean Brown (Kevin), was awarded to Joan M. Brown (Mrs. Brown). Mrs. Brown continued to reside in Tucson with Kevin where visitation rights were exercised by the appellant, Michael J. Brown (Mr. Brown). However, on August 6, 1965, Mrs. Brown and Kevin left the State of Arizona, and moved to Des Plaines, Illinois, a suburb of Chicago. She gave no prior notice of this move to Mr. Brown, but left a note to him on the door of her prior residence advising him of her new address. There is no question but that she became legally domiciled in Illinois, and has resided there ever since.

In the original decree of divorce containing the grant of custody to Mrs. Brown, no mention was made that she must continue to reside in Arizona, nor was there any provision that she could not change her domicile and that of Kevin without prior permission of the court. Therefore, when she departed for Illinois she was within her legal rights.

However, the parties got into difficulties over visitation rights. Mr. Brown filed an Order to Show Cause with the Pima County Superior Court, and on June 17, 1966, a stipulation of the parties and an Order of the Court was filed, reaffirming Mr. Brown's visitation rights. This action was taken with full knowledge of all concerned that Mrs. Brown and Kevin were then lawfully domiciled in Illinois. The next day Mrs. Brown sent Kevin, alone, to Tucson by airplane. After the child's return to Illinois, Mrs. Brown failed to return Kevin during other visitation periods outlined in the order of the court.

After this trip Mrs. Brown said that she was fearful for the welfare of Kevin in traveling alone across the country, and so informed Mr. Brown in a telephone conversation with him on November 22, 1966, which he had taped. She told him that she would be most happy to allow Kevin to come to Arizona for a visit if he would

come and get him, or would arrange to have some competent adult travel with him on the trip. Thereafter—on the 19th day of December 1966—Mr. Brown had his mother and sister, without the knowledge or the consent of Mrs. Brown, take Kevin from school and put him on a plane, alone, for the trip to Phoenix, Arizona, and, on the same day, he had a temporary restraining order and an Order to Show Cause issued and served upon Mrs. Brown's attorney of record in the original case, together with a copy of a petition for a change in custody.

A hearing was held on the Order to Show Cause, and, as a result, the court amended the original decree, and awarded custody of Kevin to Mr. Brown. It also sentenced Mr. Brown to two days in jail for contumaciously removing Kevin from his school in Illinois prior to vacation time. Mrs. Brown personally appeared in response to the Order to Show Cause, and was represented by counsel.

The trial court entered a minute entry on January 16, 1967, but, because of extensive interim procedures, the formal, final judgment was not entered until November 6, 1967.

The Court of Appeals, Div. 2, affirmed the judgment of the trial court, and both parties petitioned for review by this Court. 10 Ariz.App. 388, 459 P.2d 115.

Both appellant and appellee question the trial court's jurisdiction to enter a final judgment more than sixty days after submission of the matter.

Appellee Mrs. Brown claims the court should have dismissed the case when it became clear that the child was abducted from Illinois to Arizona in violation of the court's order. She also contends that there was insufficient proof of change in circumstances to justify a change in custody, and objects to the admission into evidence of events and conditions prior to the order of June 17, 1966.

However, it is not necessary to consider these questions since our recent decision in Johnson v. Johnson, 105 Ariz. 233, 462 P. 2d 782, disposes of this matter. We there reaffirmed our holding in In re Hughes, 73 Ariz. 97, 237 P.2d 1009, where we said:

"* * * 'A state can exercise through its courts jurisdiction to determine the custody of children or to create the status of guardian of the person *only if the domicil of the person placed under custody or guardianship is within the state.'* (Emphasis supplied.) See also Griffin v. Griffin, 95 Or. 78, 187 P. 598; and Duryea v. Duryea, 46 Idaho 512, 269 P. 987.'"

But, in Johnson v. Johnson, supra, we also said:

"* * * we wish to make it indelibly clear that our holdings do not countenance the 'stealing' of a child and taking it to another state for the purpose of obtaining jurisdiction there. That would not change the legal domicile of the child. This was clearly expressed in Ex Parte Lorenz, supra [194 Or. 335, 241 P.2d 142, 242 P.2d 200]:

"'The rule we have adopted will, as a whole, tend to discourage kidnapping, as well as contempt for the lawful decrees of a court of a sister state. An opposite rule, as contended for by defendant, would not only place the stamp of approval upon kidnapping and contempt, but would make this state a mecca for all persons seeking to evade the jurisdiction of the courts of the state of their original domicile. It would amount to a tacit admission, at least, that our own decrees in similar situations are of no effect beyond our boundary lines.

"'We quote from the author of the note in 4 A.L.R.2d at page 15, as follows:

"'"In a few cases, notably those from the state of Washington, it has been the policy of courts, on finding the child within its borders but domiciled in another state, not to decide the question of proper custody on the merits—barring exceptional cases of temporary custody arising out of immediate emergency— * * *

"' "It is submitted that the adoption of such a policy by the courts generally would tend to discourage kidnapping by parents or evasion of the jurisdiction of the domicil by physical removal elsewhere. To be sure the courts generally profess to condemn such conduct, but so long as a party has reason to believe that he may fare better in a foreign court, the assumption of jurisdiction by foreign courts will tend to encourage the practice." (Italics ours.)' "

Professor Ehrenzweig refers to this doctrine as the "Washington rule" of "clean hands," and he claims that "* * * There are thirty-one states whose case law, in the virtual absence of authority to the contrary, may well be held to represent prevailing authority." Ehrenzweig, Conflict of Laws, § 88 (West Pub. Co. 1962).

There is one difference between the instant case and the usual "clean hands" case. Here there was no order by the courts of Illinois—the only decree being the Arizona one rendered in the original action. But this does not alter the underlying principle of the "clean hands" rule that courts should not "* * * be accessories after the fact to disorderly practices of individual parents or others who thus seek to avoid the normal processes of justice * * *." Wicks v. Cox, 146 Tex. 489, 208 S.W.2d 876.

This case is analogous to Shippen v. Bailey, 303 Ky. 10, 196 S.W.2d 425, where the Ohio court, as part of its original decree of divorce, awarded custody of the children to the mother, who was domiciled in Ohio. However, prior to these proceedings, the mother, due to economic conditions, turned the care and control of the children over to their maternal grandmother, who was domiciled in Pennsylvania. Some ten years later, the father—without consent—took the children from the home of their grandmother to his home in Kentucky. In so taking them the father did not violate any order of a Pennsylvania court, nor did he remove them from the direct control of the mother, but the Kentucky court held, in part:

"The judgment of the Ohio court with respect to the custody of the children is not of controlling or, indeed, material importance. It was rendered 10 years ago when the children were mere infants. Moreover, it may be that they were not within the jurisdiction of the Ohio court, as they were then living with their grandparents in Pennsylvania, so that the judgment was ineffectual. See Callahan v. Callahan, 296 Ky. 444, 177 S.W.2d 565.

\* \* \* \* \* \*

"But the manner in which this father obtained the custody of these children can not under any circumstances be sanctioned by the courts. He had no right to take the law into his own hands and take his children away from the actual custody of their grandmother. They were in the constructive custody of their mother, to whom the Ohio court had awarded them. To adjudge their custody to him under these circumstances would put the stamp of judicial approval upon that wrongful act.

\* \* \* \* \* \*

"* * * He [the father] is not without remedy, for he has recourse to the courts of Pennsylvania or Ohio, wherever the children may be domiciled."

In the early case of Taylor v. Jeter, 33 Ga. 195, 81 Am.Dec. 202, an uncle wrongfully took a child from his domicile in Alabama into the State of Georgia. The Georgia court there said:

"The plaintiff in error stands before the Court in the attitude of one who tortiously seized and abducted a minor, thereby claiming to have given jurisdiction over his person to a Court in Georgia, and then calling upon that Court to exercise that jurisdiction in legalizing the tort. Doubtless he meant kindly, meant well, to the infant, and that may be, if not a justification, a paliation of the act, in a moral point of view, but in law there is for it neither the one nor the other.

\*    \*    \*    \*    \*    \*

"\*   \*   \* Shall the Courts of Georgia avail themselves of a tort to wrest from those of a sister State a jurisdiction properly appertaining to them? We say not; rather let the subject be remanded to them. The grant of guardianship by the Court of Probates does not, any more than did the decree in chancery, confer upon the appointee a vested title. It simply reposes in him a trust for the benefit of the infant, revocable whenever abused.

"We repeat, to the Courts of Alabama properly belongs this jurisdiction, with them is the responsibility, which, we doubt not, will be well met, and to their keeping we think the Court below very properly remanded this tender victim of a family feud."

Therefore, under the rule of "clean hands" a court of this state should not, even where its own order is involved, put its stamp of approval on a wrongful abduction from a sister state.

Abductions should not be recognized as giving courts jurisdiction. To do so would encourage actions which could result in sorrow and anguish to the parent who would not know the whereabouts of a child which had been abducted, and which could be detrimental to the child's physical and mental well-being. It would permit and encourage parents, dissatisfied with one court, to take a child unlawfully to another state and conceal its whereabouts until they were ready to apply for custody in a state in which it was believed the court would be more favorable.

Mr. Brown has his recourse by availing. himself of the normal processes of justice in the courts of the state of domicile.

The decision of the Court of Appeals is vacated. The judgment of the Superior Court is vacated, and custody of child, Kevin, is ordered returned to the mother.

UDALL, C. J., LOCKWOOD, V. C. J., and STRUCKMEYER and HAYS, JJ., concur.