**SONYA C., a minor child By and Through her legally appointed guardians Francisco and Elva OLIVAS; and Francisco and Elva Olivas, husband and wife, Plaintiffs,**

v.

**ARIZONA SCHOOL FOR THE DEAF AND BLIND, et al., Defendants.**

**No. CIV 89–099 TUC ACM.**

United States District Court,
D. Arizona,
Tucson Division.

July 23, 1990.

---

**8.** The Court notes that the Board took one year to issue its investigative findings and "Order".

Carl A. Piccarreta, Davis, Gugino & Piccarreta, P.C., Tucson, Ariz., for plaintiffs.

Robert K. Corbin, Atty. Gen., Sarah A. Bailey, Asst. Atty. Gen., Tucson, Ariz., for defendants.

## MEMORANDUM OF DECISION

MARQUEZ, District Judge.

On July 10, 1990, this Court, by Minute Entry, ruled in favor of plaintiffs on the issue presented for judicial review. The following memorandum explains the reasons for the Court's order.

## INTRODUCTION

### Procedural Background

This is a judicial review of an administrative decision of the Arizona Department of Education (ADOE), pursuant to the Education of the Handicapped Act (EHA), 20 U.S.C. § 1401 *et seq.*, relating to the free education of Sonya Castro, a deaf student at the Arizona School for the Deaf and Blind (ASDB).

In July 1988, an initial administrative hearing was held to determine if Sonya, then a minor, was a resident of Arizona for the purpose of receiving tuition-free education at ASDB. It was a "change of placement" due process evidentiary hearing. The Impartial Hearing Officer decided that Sonya was an Arizona resident.

ASDB appealed the decision to the ADOE. The Appeals Hearing Officer reversed the decision below, finding that Sonya was not an Arizona resident. Her court-appointed guardians, Francisco and Elva Olivas, then filed this action, seeking judicial review of the ADOE decision, and a declaratory judgment that Sonya has been since 1984 an Arizona resident entitled to free educational services. Defendants ASDB, Arizona State Board of Education, and C. Diane Bishop, Superintendent of Public Instruction, brought a pendent state counter-claim, seeking payment for out-of-state tuition for the years Sonya had been enrolled tuition-free at ASDB.

### Jurisdiction

The EHA provides at 20 U.S.C. § 1415(e)(2) that any party aggrieved by the findings and decision made on appeal by a State educational agency may bring an action in a United States district court regardless of the amount in controversy. Defendants have moved to dismiss this action for lack of jurisdiction of Sonya, the real party in interest. This motion is based on the fact that Sonya reached the age of majority in December 1989. No authority is cited for this argument. Defendants alternatively argue that the guardianship was void at its inception, and cannot form the basis for jurisdiction here. *The validity of the guardianship is a crucial issue which this Court must review as part of the administrative decision.*

■ The Court finds that Sonya is a named plaintiff, with or without her guardians, and that judicial review of the ADOE decision is authorized. Sonya's legal right to this review continues despite her reach-

ing the age of majority. She continues to receive an education at ASDB. One of the issues for review is her status as an Arizona resident. If she is not a resident, she is subject to a tuition payment obligation imposed by state statute. Tuition at ASDB exceeds $30,000.00 per year.

■ The Court further finds that the Olivas' have standing to litigate this action. As Sonya's guardians they admitted her to ASDB, and they would be adversely affected if this Court were to determine that she was not entitled to free tuition between 1984 and 1989. They could be required to reimburse ASDB $122,939.00 for tuition and residential care.

Accordingly, the Court concludes that it has subject matter jurisdiction over this action.

*Standard of Review*

The EHA provides at § 1415(e)(2) that

the [reviewing] court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

The Court has reviewed the record, and deems this matter submitted on the papers, without the necessity of oral argument. Good cause appearing therefor, the Court finds and orders as follows:

DISCUSSION

*Factual Background*

Sonya was born in Yuma, Arizona on December 17, 1971. She is significantly hearing impaired, and is a handicapped child for purposes of the EHA. For purposes of A.R.S. § 15–1343 (defining persons entitled to education at ASDB) she is sensory impaired. Her parents are Mexican citizens who reside in Puerto Peñasco, Mexico. Sonya was raised in Puerto Peñasco until 1984, when she was sent to

live with long-time family friends Francisco and Elva Olivas [1] in Ajo, Arizona. At this time she was twelve years old.

In late August 1984, Mr. Olivas attempted to enroll Sonya in the Ajo public schools. He was advised by school personnel that they did not have a suitable program for Sonya. The Ajo public schools recommended ASDB. (July 9 hearing, RT 135–136) Mr. Olivas was told by either the Ajo public schools or by ASDB personnel that a guardianship would be necessary, so that a responsible person living in the United States could make decisions for Sonya's welfare. (July 9 hearing, RT 136–137) [2] On September 4, 1984, Olivas contacted attorney Peter Brown in Ajo to arrange for a guardianship. Brown then prepared a petition for guardianship of Sonya, for filing with the Pima County Superior Court. (July 23 hearing, RT 8–11)

On September 5, 1984, an Application for Enrollment at ASDB was submitted on Sonya's behalf. (Numbered Exhibit 20) No one in the Ajo public schools or at ASDB ever discussed or mentioned any tuition payment obligations to the Olivas' or to Brown. (July 9 hearing, RT 112–13, 117, 142; July 23 hearing, RT 20; Numbered Exhibit P–6)

Brown had previously obtained guardianships for children from other states who were to attend a school in the Tucson Unified School District Number 1, but whose parents did not live in District 1. (July 23 hearing, RT 8–9) It was the policy of the district at that time that if a legal guardian was appointed who was a resident of District 1, that would confer with District 1 the authority to enroll the child in school. In Brown's experience the schools would allow matriculation with evidence that a petition had been filed, as long as they had a final result in about sixty days. (July 23 hearing, RT 9–10)

---

1. The record shows that Elva Olivas was raised in Puerto Peñasco, and that the two families have been friends since about 1973. (July 9 hearing, RT 138–39)

2. The record is not clear on this point; Mr. Olivas' testimony appears to indicate that ASDB

officials spoke to him regarding the necessity of obtaining a guardian for Sonya, however no ASDB official recalls doing this. *See e.g.* testimony of James Keller, July 9 hearing, RT 95; testimony of Barry Griffing, July 15 hearing, RT 90–91.

Brown assumed the policy was similar at ASDB. He wrote to the school on September 5, 1984, enclosing a copy of the petition for guardianship, and informing them that a hearing on the petition would take place on September 28. The purpose of the letter was to allow Sonya to enroll at ASDB prior to the formal appointment of the Olivas' as her guardians. (Numbered Exhibit 19; July 23 hearing, RT 10–11)

No one was misled, nor was there an attempt to mislead anyone, regarding Sonya's parents' residence in Mexico. (July 9 hearing, RT 113, 141–42; July 15 hearing, RT 66–67) This information was made available to ASDB on Sonya's application form, (Numbered Exhibit 20), and in the copy of the parental Consent to Legal Guardianship form provided to ASDB by Peter Brown as an attachment to his September 5 letter. (Unnumbered Exhibits, Document 278; July 23 hearing, RT 10–11, 28)

The Olivas' were appointed as Sonya's guardians by the Honorable Lillian Fisher on September 28, 1984. (Minute Entry, *In the Matter of the Guardianship of Sonja [sic] Estella Castro*, Unnumbered Exhibits, Documents 282–83). Sonya was officially admitted to ASDB, tuition-free, on that same day. (July 19 hearing, RT 124) She has been a boarding student at ASDB since the fall of 1984.

The guardianship was sought primarily so that Sonya could attend school in the United States and learn skills sufficient to reside here. (July 9 hearing, RT 139; July 23 hearing, RT 14–15; Petition for Appointment of Guardian of a Minor, Unnumbered Exhibits, Document 277; Feb. 25, 1988 ASDB Board of Directors Meeting Minutes at 3, Numbered Exhibit P–34) Sonya's intent to remain in this country after graduation from ASDB is an issue disputed by the parties.

Since obtaining guardianship of Sonya, the Olivas' have received no financial support from her natural parents. (July 9 hearing, RT 152) Sonya is listed as a dependent on Mr. Olivas' state and federal tax returns since 1984. (July 9 hearing, RT 143; Numbered Exhibit P–18) Olivas maintains health and dental insurance for Sonya. (July 9 hearing, RT 144; Numbered Exhibits P–16, P–17) Sonya receives monthly SSI checks in the amount of $235.00, for which Elva Olivas is the representative payee. (July 9 hearing, RT 148–50)

The Appeals Hearing Officer found that during school holiday recesses and summer vacation, Sonya resided with her family in Puerto Peñasco, and that the Olivas' had had Sonya reside with them for short periods of time, ordinarily on weekends and short holiday recesses. When Sonya goes to Mexico to visit her parents, she is usually accompanied by Mr. or Mrs. Olivas. She needs a visa to travel to Mexico. (July 9 hearing, RT 150–153)

In Mr. Olivas' opinion, he and his wife are responsible for Sonya's welfare. They consider her part of their family. They make many decisions concerning her education at ASDB, and have had many contacts with ASDB authorities. (July 9 hearing, RT 152) The record contains copies of thirty "Parent Contact" forms which record telephone conversations between ASDB staff and the Olivas', and also between staff translating for Sonya in conversations with the Olivas'. (Unnumbered Exhibits, Documents 32–61)

In these conversations, staff ask the Olivas' for permission to discipline Sonya; to release her for field trips and to spend the weekend with friends. Other privileges such as extended curfew hours, leaving campus to shop, or inviting male students to her room, are discussed. The Olivas' consent to certain of these and refuse consent to others. Sonya asks the Olivas' to send her money, and asks for permission to buy certain things. There are also communications concerning who will pick Sonya up for vacations, and when. The Olivas' call to advise they will be coming to visit Sonya. Many of the conversations close with "I Love You" and "I Love You Too" or words to that effect. In two or three of the conversations, mention is made that Sonya will travel to her home in Puerto Peñasco, or that her mother rather than the Olivas' will pick her up for vacation.

In September 1984, the ASDB admissions policy was based on age, residency and evidence of sensory disability. (July 15 hearing, RT 13–14) With regard to residency, the policy was to admit any ward of an Arizona resident, upon presentation of a Superior Court order. The assumption was that the residence of the child was the same as that of the guardian, and it was the policy of the school not to question or look beyond the guardianship order. (July 9 hearing, RT 84, 87; July 15 hearing, RT 17–18, 138–39; July 19 hearing, RT 22–23, 41, 90–91, 106–07)

During the time this admissions policy was in effect, minors from other states attended ASDB as tuition-paying students. Their tuition was paid for by their parents or by their state government. They were not required to obtain a local guardian as a prerequisite to enrollment. (July 9 hearing, RT 115, 125; July 15 hearing, RT 68–69)

Sometime in the summer of 1985 the Arizona Attorney General's office questioned ASDB officials regarding the propriety of admitting to ASDB children from Mexico who had guardians appointed in Arizona. (July 15 hearing, RT 20–21, 28)

By letter dated July 28, 1986, Arizona Assistant Attorney General Sarah Bailey advised ASDB Superintendent Dr. Barry Griffing that the admission of Sonya and six other children to ASDB was improper and could result in personal liability of ASDB personnel for approximately $289,-000.00 in back tuition. (Numbered Exhibit R–5) This issue was discussed at an executive session of an ASDB Board meeting on August 21, 1986. After that meeting the children were ordered removed from ASDB, until it was determined (as a result of legal action initiated by their guardians) that the removal had violated their due process rights under the EHA. They were then reinstated at ASDB. (Numbered Exhibits P–12, P–26, P–1A, P–32; July 15 hearing, RT 29–31, 34–39)

After this incident, Dr. Griffing and Board President Edward Berger contacted outside legal counsel to determine whether existing admissions practice was proper. Griffing was advised by three different attorneys that under existing law the current ASDB policies were appropriate, and that the correct solution to the problem would be to change the state legislation which governed admission procedures at ASDB. The Attorney General's office later reimbursed Griffing and Berger for the costs of this legal advice. (July 15 hearing, RT 41–42, 93–94)

Immediately after receiving this legal advice, Griffing spoke to Bailey and others in the Attorney General's office about how to change A.R.S. § 15–1346, which authorized state residents to attend ASDB free of charge. The Attorney General's office eventually drafted new legislation, A.R.S. § 15–1343, which was adopted by the Arizona legislature and became effective in May 1987. It requires payment of tuition in cases where guardian/ward relationships were created for the primary purpose of circumventing the payment of tuition. (July 15 hearing, RT 43–44)

The ASDB policy concerning admission of wards of Arizona guardians changed following adoption of this legislation. The new admission policy established procedures for testing the intent of each guardianship, including an ASDB Domicile/Residence Affidavit. (July 15 hearing, RT 19, 44–45) Elva Olivas completed one of these affidavits for Sonya on August 15, 1987. (Numbered Exhibit P–30) Francisco Olivas was unaware of this affidavit and did not participate in its preparation. (July 9 hearing, RT 157–58)

The affidavit asked "Who is the child presently living with?" Elva Olivas answered that "She is living with my family." Another question was: "When school is not in session, (i.e. summer vacation, Christmas vacation) where and with whom will the child stay?" Elva Olivas answered that "She goes with her mother." The affidavit also contained the question: "What was your reason for assuming custody?" Six options were given as answers, including "to assure enrollment in ASDB tuition-free". This was the option checked by Elva Olivas when she completed the affidavit.

As part of the new policy of testing guardianships, Dr. Griffing, Associate Superintendent Kenneth Rislov, James Keller, Director of ASDB Department of the Deaf, and TUSD employee Gene Webber and his assistant reviewed all existing guardianships to test the intent of the parties when they were created. This process included interviews of the guardians, which were conducted by Griffing, Rislov, and the two TUSD employees. (July 15 hearing, RT 46–48)

In Griffing's opinion, Sonya is an Arizona resident, was properly enrolled and admitted to ASDB in 1984, and was properly re-enrolled and readmitted in 1985, 1986 and 1987. He bases this opinion on the affidavit, his interviews with the Olivas', and especially on Sonya's Arizona birthplace. (July 15 hearing, RT 64–66, 148) Rislov is unable to form an opinion as to whether Sonya is an Arizona resident, without first obtaining an independent legal review of the impact of her United States citizenship on the residency issue. (July 19 hearing, RT 60, 62)

When the existing guardianships were evaluated in 1987, Rislov's recommendation to Griffing was that Sonya not be granted resident status for tuition purposes. (July 19 hearing, RT 59–60) Despite this lack of consensus, the results of the interviews and review of information were presented to the ASDB Board of Directors at their October 8, 1987 meeting. At the meeting, the Board voted to affirm Sonya's residency status for tuition purposes. (Oct. 8, 1987 Board Meeting Minutes at 6, Numbered Exhibit P–34; July 15 hearing, RT 48–51) According to one Board member,

> ... that decision was made after much deliberation. The Board felt that the fact that [Sonya] was born in Yuma established a legitimate guardianship; that it was not a sham or excuse for the avoidance of paying tuition.

(Dec. 22, 1987 Board Meeting Minutes at 4, Numbered Exhibit P–34)

On November 10, 1987, Griffing wrote to the Olivas' to inform them of the Board's decision. (Numbered Exhibit P–29) He again wrote to the Olivas' on November 19, to advise them that the Board's decision was subject to further review by the Arizona Attorney General's office. (Numbered Exhibit P–27; July 15 hearing, RT 52–53)

At a December 22, 1987 Board meeting, at least one Board member suggested rescinding the prior decision, out of concern for personal liability of Board members, as explained to them at that meeting by Sarah Bailey. (Dec. 22, 1987 Board Meeting Minutes at 3, Numbered Exhibit P–34; July 19 hearing, RT 17–19)

The question of Sonya's residency was again placed on the February 25, 1988 ASDB Board meeting agenda, as a result of continuing conversations and correspondence between Griffing and the Attorney General's office. (July 15 hearing, RT 168–169)

At this meeting the Board members and Sarah Bailey discussed the process to be used in determining tuition-free enrollment eligibility of ward students. It was agreed that eligibility should be determined only by residency of the natural parents. The prior decision regarding Sonya's residency status was rescinded at this meeting. (Feb. 25, 1988 Board Meeting Minutes at 1, 8, Numbered Exhibit P–34)

On March 1, 1988, Acting Superintendent Rislov wrote to the Olivas', informing them of the Board's decision, and that they were liable for back tuition in excess of $85,000.00. The Olivas' were further informed that unless tuition payments of approximately $35,000.00 for the 1987–88 school year were made by April 1, Sonya would not be allowed to return to ASDB following spring break. (Numbered Exhibit P–3)

On April 14, it was decided that Sonya could return to ASDB pending further action, again after the Olivas' (through their attorney) had asserted violation of her due process rights under the EHA. (April 14, 1988 Board Meeting Minutes, Numbered Exhibit P–34; Numbered Exhibits P–33, P–8)

Between 1984 and 1988, ASDB received from ADOE a total of $24,669.00 in special education institutional voucher funds for

Sonya. (Numbered Exhibit R–6) These funds were commingled with ASDB's general fund money, and used to pay salaries of teachers, administrators and other staff. (July 19 hearing, RT 74, 109) Tuition-paying students do not generate voucher funds. (July 19 hearing, RT 118)

### Initial Administrative Decision

The Impartial Hearing Officer found that under Arizona law in 1984, Sonya's guardianship was legitimately sought and granted, pursuant to statutory language and existing precedent. He further found that ASDB officials, the Olivas', and their attorney acted in the good faith belief that the guardianship entitled Sonya to tuition-free attendance at ASDB; and that all parties proceeded according to existing custom and consistent with generally understood principles of law in Arizona. The Hearing Officer found no evidence whatsoever that Sonya's admission was effected conspiratorially to defraud the State of Arizona; in fact, he called this theory "nonsensical".

Having found that Sonya was entitled to a tuition-free education at ASDB in 1984, the Hearing Officer examined the effect of the 1987 adoption of A.R.S. § 15–1343 on her eligibility for free services. He concluded that the legislation did not remove Sonya's eligibility for services, because a denial of her residency through the guardianship would deprive her of the benefits of her United States citizenship. As a minor child of non-citizens,

> all that Sonya could do to establish access to public schooling and her residency in Arizona was to seek a guardian who was a resident citizen. Indeed, when she first joined the family that was later appointed her guardians, they expected that she would live with them and attend local schools in Ajo. It is solely because those schools could not provide an appropriate education that she came to attend ASDB.... it is clear that she did intend to leave her family, enter the United States, and enjoy the benefits of her citizenship.

(Hearing Officer's Decision at 7, Unnumbered Exhibits, Document 124)

### Decision on Appeal

On appeal, the Appeals Hearing Officer found that the decision below had been unreasonable and arbitrary. He found the following: there was insufficient evidence in the record to show that Sonya became a legal resident of Arizona by virtue of the 1984 guardianship; there was insufficient evidence that her admission to ASDB was consistent with generally understood principles of law or was based on a reasoned interpretation of residency law; there was insufficient evidence to show that she was not a citizen of Mexico or that she intends to remain in Arizona following her education; and there was no evidence to show that all parental rights had been terminated when the guardianship was imposed.

The Appeals Hearing Officer also found that "residency", for purposes of A.R.S. § 15–1343, is equated with a person's domicile; that a minor's domicile of origin is that of its parents, and the domicile is maintained until abandoned in favor of another (presumably this is impossible for an unemancipated minor); that Sonya's residence did not transfer to ASDB or to the Olivas' home, but remained at all times her domicile of origin in Puerto Peñasco:

> [Sonya's] status as an American citizen ... does not equate with a right to garner tuition free education in any State of the United States; she must first establish her legal residence in order to obtain such free educational services and she has not demonstrated either her residence with her guardian or an intent to remain in Arizona in order to support such legal residence.

(Appeals Decision at 24–25, Unnumbered Exhibits, Document 250)

The Appeals Hearing Officer found that ASDB officials either did not seek or did not appreciate legal counsel as to the adequacy of the guardianship order, but rather accepted it at face value as a transfer of legal residence; that they did not investigate the circumstances under which the guardianship was created, i.e. whether it was a true supplantation of the parents' legal rights or whether it was established as a legal device to circumvent tuition re-

quirements; that since they knew of Sonya's parents' continued care and control of her, it should have been obvious that all parental rights of custody had not been terminated; that nothing in the record indicates whether a full disclosure of the facts was presented to the attorneys consulted by ASDB officials in 1985, and no written record of any advice or conclusions rendered exists.

> By accepting the guardianship orders at face value, [ASDB] did not act in 'good faith reliance on a reasoned interpretation of the law'.... While [ASDB] may have been acting pursuant to custom and practice, those customs and practices were at variance with the state of the law as it existed at the time....

(Appeals Decision at 18–19, Unnumbered Exhibits, Document 250)

In light of the above, the Appeals Hearing Officer found it unnecessary to consider the effect of the 1987 legislation. Nor did he address the issue of liability for tuition payments dating from Sonya's 1984 enrollment at ASDB.

*Legal Issues*

### Arizona Residency

■ The Court finds that in 1984, Sonya's United States citizenship, physical presence in Arizona and wardship to long time family friends was prima facie evidence of residence/domicile, entitling her to a free public education among other benefits and privileges.

In *Vlandis v. Kline,* 412 U.S. 441, 93 S.Ct. 2230, 37 L.Ed.2d 63, (1973), the Supreme Court approved a rigorous domicile test as a reasonable standard for determining the residential status of a college student who wished to qualify for resident tuition. The test contemplated that

> '[i]n general, the domicile of an individual is his true, fixed and permanent home and place of habitation. It is the place to which, whenever he is absent, he has the intention of returning.'

*Vlandis,* 412 U.S. at 454, 93 S.Ct. at 2237 (quoting Opinion of the Attorney General of the State of Connecticut Regarding Non–Resident Tuition, Sept. 6, 1972 (unreported)).

In *Martinez v. Bynum,* 461 U.S. 321, 103 S.Ct. 1838, 75 L.Ed.2d 879 (1983), the Court declared that this strict standard may not be applied to school-age children in the same way as to college students. Instead, the Court found that a school district

> ... generally would be justified in requiring school-age children or their parents to satisfy the traditional, basic residence criteria—*i.e.,* to live in the district with a bona fide intention of remaining there—before it treated them as residents.

*Martinez,* 461 U.S. at 332, 103 S.Ct. at 1844. The Court pointed out that

> the 'intention to remain' component of the traditional residency standard does not imply an intention never to leave. Given the mobility of people and families in this country, changing a place of residence is commonplace. The standard accommodates that possibility as long as there is a bona fide present intention to remain.... In most cases, of course, it is the intention of the parent *or guardian* on behalf of the child that is relevant.

*Id.* 103 S.Ct. at 1844 at nn. 13–14 (emphasis supplied).

*Martinez* involved a facial challenge to the constitutionality of a Texas residency requirement governing minors who wished to attend public free schools while living apart from their parents *or guardians.* The subject minor was born in the United States to Mexican parents, and raised in Mexico until the age of eight. At that time he returned to Texas for the primary purpose of attending school there. He lived with an older sister *who was not his guardian.* He was found ineligible for public free school education in Texas.

The Court upheld the statute in *Martinez* as a bona fide residence requirement. Justice Brennan, in a concurrence, emphasized that the Court did not address the question of the statute's constitutionality *as applied* to the subject minor, a United States citizen child of non-resident alien parents:

> [i]f this question were before the Court, I believe that a different set of considerations would be implicated which might

affect significantly an analysis of the statute's constitutionality.

*Id.* at 333, 103 S.Ct. at 1845.

The Olivas' guardianship of Sonya was validly granted in 1984. *See* discussion *infra.* Under *Martinez,* the Olivas' intent at that time that Sonya reside with them in the State of Arizona and attend school there can be imputed to her. By means of her wardship to the Olivas', Sonya became an Arizona resident in 1984, and the State of Arizona therefore became liable for the expenses of her tuition at ASDB.[3]

### The Guardianship

The Court finds that the Olivas' guardianship of Sonya was validly granted after a full hearing and with full disclosure of Sonya's Mexican parentage. At the time that the guardianship proceedings were instituted, ASDB officials were provided with copies of all relevant court pleadings and documents. Should they have chosen to do so they could have sought to intervene in the guardianship proceedings.

Once a judgment has been entered by a court of general jurisdiction, a presumption of regularity attaches thereto. *Coshatt v. Calmac Manufacturing Corp.,* 124 Ariz. 177, 178, 602 P.2d 845, 846 (App. 1979). Such a judgment may not be collaterally attacked unless it is void. A judgment is void if the rendering court lacked personal jurisdiction, subject matter jurisdiction, jurisdiction to enter the particular order involved, or if the court acted in excess of its jurisdiction. Additionally, a judgment may be void if "extrinsic" fraud is involved. *Bill v. Gossett,* 132 Ariz. 518, 520, 647 P.2d 649, 651 (App.1982).

Defendants contend that the guardianship was and is void from its inception; that Sonya was a resident of Mexico, the place where her parents were domiciled; that the courts of Mexico correctly had jurisdiction; that Sonya was not properly before the Arizona court; and that the court's order appointing guardian was therefore without jurisdiction. Defendants rely on *Brown v. Brown,* 105 Ariz. 273, 463 P.2d 71 (1969). Although *Brown* does say that

> [a] state can exercise through its courts jurisdiction to determine the custody of children or to create the status of guardian of the person *only if the domicil (sic) of the person placed under custody or guardianship is within the state ....*

105 Ariz. at 274, 463 P.2d at 72 (emphasis in original), *Brown* and the cases cited therein involved situations of children abducted by one parent and removed from the jurisdiction after a divorce. *Brown* is inapposite to this case.[4]

Defendants alternatively contend that the guardianship is invalid because it was a "sham", obtained solely in order to evade tuition. They rely on *School District No. 3 of Maricopa County v. Dailey,* 106 Ariz. 124, 471 P.2d 736 (1970). In that case, the children and their parents resided outside Tempe # 3 District. The parents sought to have their children enrolled tuition free in Tempe schools, and obtained a guardian who resided in that district. The guardian alleged that the Tempe schools had more to offer than the district in which the children resided, and that therefore it was in their best interests to attend school in Tempe. The guardian attached parental consents for the guardianship, which was granted.

---

3. *See Brownsville Independent School District v. Gamboa,* 498 S.W.2d 448, 450 (Tex.1973) (school district required to provide free education to United States citizen child of non-resident alien parents, raised in Mexico until school age, where guardianship granted one month after child's arrival in this country, and even if initial purpose for sending child here was public free school attendance).

4. Defendants also cite A.R.S. § 8–403(A)(2), which requires that a child have a "significant connection" with this state before the Superior Court makes a child custody determination.

The statute does not mention guardianships, and appears to have been enacted for application in the divorce context. Even assuming that Sonya's birth in Yuma did not give her a significant connection to this state, A.R.S. § 8–403(A)(4) provides that the Superior Court may make a child custody determination where "[i]t appears that no other state would have jurisdiction under prerequisites substantially in accordance with paragraphs 1, 2 or 3 ... and it is in the best interest of the child that this court assume jurisdiction."

The Tempe School District later demanded tuition from the parents, including back tuition for the period during which the district was unaware that the parents did not reside within the district. The Arizona Supreme Court determined that it was error to permit the children to enroll in Tempe schools, as they were not "residents" of the district. 106 Ariz. at 127, 471 P.2d at 739.

*Dailey* is distinguishable from this case because there, the guardianship was in name only, and the children continued to live with their parents outside Tempe. The guardianship in *Dailey* was created for the sole purpose of enabling the children to attend a specific school.

■ In this case, the primary purpose for obtaining the guardianship was the Olivas' desire to enroll Sonya in school. This is a permissible purpose. The guardianship was also important for a myriad of reasons bearing on Sonya's physical, mental, moral and emotional health. Without it the Olivas' could not obtain insurance benefits for Sonya; consent to medical treatment; or consent to evaluation and placement pursuant to the EHA. The Court takes judicial notice that life in the United States offers greater opportunity in general, than life in Mexico. This is especially true for a handicapped child like Sonya.

The Olivas' guardianship of Sonya was not obtained in order to circumvent the payment of tuition at ASDB, because they were unaware of any such payment obligation. Rather, the guardianship was obtained because, *after* the Olivas' had attempted to enroll Sonya in the Ajo public schools and had instead been directed to ASDB, they were told that a guardianship would be necessary so that a responsible person living in the United States could make decisions for her welfare. No one in the Ajo public schools or at ASDB ever discussed or mentioned any tuition payment obligations to the Olivas' or to their attorney.

In their Petition for Appointment of Guardian of a Minor, the Olivas' alleged that the circumstances had evoked a termination of parental rights in regard to Sonya. (Unnumbered Exhibits, Document 281) While an allegation of permissive suspension of parental rights might have been more technically accurate under the circumstances, the allegation made does not constitute extrinsic fraud, so as to render the guardianship order vulnerable to collateral attack at this juncture.

■ The validity of the guardianship did not depend on a showing of abuse, neglect, abandonment, or severance of parental rights. *See Stansell v. Superior Court*, 125 Ariz. 82, 607 P.2d 959 (1980).[5] The paramount concern of a court in a guardianship proceeding is the best interest of the child. Even if the state had appeared at the hearing to protest the guardianship, it would have been an abuse of discretion for the court to consider tuition concerns at that hearing. *See Guardianship of Cruz*, 154 Ariz. 184, 741 P.2d 317 (App.1987).

The facts of *Cruz* are very similar to those of this case. In *Cruz*, the subject minor was born in Arizona and raised by her parents in Agua Prieta, Mexico until the age of eleven, when she was sent to live with her aunt in Nogales, Arizona. The aunt sought to enroll her in public school, and the school requested that a guardianship be obtained.

The parents gave their consent to the guardianship, for the only apparent reason that they were unable to provide their daughter with an adequate education in Mexico. The petition for guardianship was denied, on the basis that the minor was sent to her aunt's for the sole purpose of receiving an education, and that granting the petition would allow the avoidance of tuition payment.

On appeal, the court held that the trial court *could not refuse* to grant the guardianship once it found that jurisdiction and venue were proper; petitioner complied with required notice provisions; parental rights were suspended by the circumstances; and the minor's best interests

---

5. In this case, the Arizona Supreme Court expressly rejected the state's argument that the granting of the guardianship would have grave consequences for the school system.

would be served by the guardianship. The *Cruz* court observed that

> the trial court abused its discretion by even considering the school district's tuition concerns. The district has a statutory remedy, under A.R.S. § 15–823 and § 15–824(B)(2), under which it may challenge the child's residency regardless of a guardianship determination.

154 Ariz. at 186, 741 P.2d at 319.[6]

For the foregoing reasons, the Court finds that the Olivas' guardianship of Sonya was legitimately sought and granted in 1984, and in any event is not subject to collateral attack in this proceeding.

### Application of A.R.S. § 15–1343

■ In view of the Court's finding that the guardianship was legitimately obtained in 1984, the Court need not address the issue of retroactivity of A.R.S. § 15–1343. The Court finds that the enactment of this legislation in 1987 did not affect Sonya's subsequent eligibility to receive services at ASDB. School officials investigated the circumstances of Sonya's guardianship, and although there was some difference of opinion among them, the presentation they made to the Board convinced the Board that Sonya was properly eligible for tuition-free education at ASDB, at least until the Board was confronted with the threat of personal liability for that tuition.

### Application of the EHA

■ Under the EHA, Arizona is required to provide special education services to Sonya, tuition-free, regardless of her residency status. The EHA provides federal funds to assist state and local agencies in educating handicapped children. To qualify for federal assistance, a state must submit a detailed plan which demonstrates a policy assuring all handicapped children the right to a "free appropriate public education". 20 U.S.C. § 1412(1). The state is also obligated to "identify, locate and evaluate all children residing in the state who are handicapped...." 20 U.S.C. § 1412(2)(C). The federal regulations which implement the EHA provide that "in no case may a recipient [state] refuse to provide services to a handicapped child in its jurisdiction because of another person's or entity's failure to assume financial responsibility." 34 C.F.R. § 104, App. A, n. 23.

In *Rabinowitz v. New Jersey State Board of Education*, 550 F.Supp. 481 (D. New Jersey 1982), the New Jersey State Board of Education was ordered to provide a free education to a handicapped child whose natural parents resided in New York state. The *Rabinowitz* court examined closely the EHA, its legislative history and the federal regulations which implement it. The court concluded that

> [t]he will of Congress could not have been more clearly expressed: if states are to accept funding under the Act, then they have an obligation to educate the handicapped children 'within [their] borders.'

550 F.Supp. at 489 (quoting *Board of Educ., etc. v. Rowley*, 458 U.S. 176, 181, 102 S.Ct. 3034, 3038, 73 L.Ed.2d 690 (1982)).

The court found a domicile requirement inconsistent with the statute's plain language; a child's domicile may determine which state pays for the education, but the child's presence determines who must provide the services:

> [t]he court can discern no congressional intent to allow a participating state to refuse to educate a handicapped child clearly within its borders for bona fide reasons.

550 F.Supp. at 486.

The *Rabinowitz* court noted that the situation in that case differed from one in which the parents unilaterally selected an institution for their child:

> [t]he court has no disagreement with the principle that a parent may not select an institution for a handicapped child without first obtaining state approval.

*Id.* at 490 n. 2 (citation omitted). Defendants here argue that Sonya's "parents

---

**6.** The cited statutes govern admission requirements and tuition payments for residents of other school districts and for non-residents.

sought admission [to ASDB] by guardians because someone told them the school would then be free. R.O.A. July 23 hearing transcript, page 24, lines 20–25; page 25, line 1." This cited passage does not exist in the record by statement or inference. Rather, the record reflects that the Olivas' on behalf of Sonya and her parents only approached ASDB after being directed to do so by their local school district in Ajo. (July 9 hearing, RT 135–36)

The Court finds that Sonya was within the borders of the state of Arizona, a recipient of EHA funds, for bona fide reasons and was therefore entitled to a free appropriate public education at ASDB.

### Constitutional Issues

■ Attendance at ASDB tuition-free is and should be one of the benefits of Sonya's United States citizenship. Although not essential to the disposition of this case, the Court includes the following discussion as illustrative of the constitutional principles guiding other courts' resolutions of similar cases.

*Matter of Moncrieffe*, 121 Misc.2d 395, 467 N.Y.S.2d 812 (Surr.Ct.1983), involved a minor U.S. citizen whose father was deceased and whose mother was a Jamaican resident. The minor was raised in Jamaica until at least the age of sixteen, when he relocated to the United States. He sought a guardianship in part to attend school in New York. His mother consented to the guardianship, even though there was no reason why she could not continue to care for her son (as long as he remained in Jamaica).

The school district appeared in opposition. The court granted the guardianship, noting that all citizens are free to establish a residence of choice even if it may incidentally afford access to a particular school. The court rejected the school district's position as violative of equal protection principles, relying in part on *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

In *Plyler*, the Supreme Court found unconstitutional a Texas statute that denied free public education to children of undocumented workers. The Court emphasized that the children of non-resident aliens could not be penalized because of their parents' actions. The Texas statute failed because it was

[d]irected against children, and imposes its discriminatory burden on the basis of a legal characteristic over which the children have no control. It is thus difficult to conceive of a rational justification for penalizing these children.

457 U.S. at 220, 102 S.Ct. at 2396.

The *Plyler* Court noted the importance of educating undocumented children who may one day be eligible for citizenship, or who may never be deportable. The Court recognized a need to prepare these children to lead productive lives in this country:

[b]y denying these children a basic education, we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic way that they will contribute in even the smallest way to the progress of our Nation.

457 U.S. at 223, 102 S.Ct. at 2398. The Court further acknowledged the importance of educating undocumented children whose intent or ability to remain in the United States is unclear:

[t]he fact that many will not [eventually become citizens] is not decisive, even with respect to the importance of education to participation in core political institutions. '[T]he benefits of education are not reserved to those whose productive utilization of them is a certainty....'

*Id.* at 222 n. 20, 102 S.Ct. at 2397 n. 20 (citation omitted). *See also Flores v. Meese*, 906 F.2d 396, 417 (9th Cir.1990) (INS agreed as part of litigation settlement to provide education to undocumented minors held in detention pending deportation proceedings).

The rationale articulated in *Plyler* holds even more true for a United States citizen child. If Sonya's parents were also United States citizens, the family could move to any state in the union, and Sonya would be eligible for free public education (and for free "special" education under the EHA, assuming the state was a recipient of EHA

funds; *see* discussion *supra* ). *See Shofstall v. Hollins*, 110 Ariz. 88, 515 P.2d 590 (1973) (holding that Article XI, §§ 1 and 6 of the Arizona Constitution establish education as fundamental right of pupils between the ages of six and twenty-one, and assure every child a basic education); *see also* A.R.S. § 15–824(E) (permitting school districts to admit tuition-free non-resident children who are United states citizens and who have certain specified relatives residing in the state, if to do so would be "in the best interest of the child.").

 It is not reasonable that Sonya be denied this benefit, and the benefit of SSI payments, and any other benefits of her United States citizenship, because she cannot enter the United States with her parents or as an unemancipated minor. This in effect would penalize her for her parents' status, in violation of her fourteenth amendment equal protection rights.

*The only way that Sonya can claim the benefits of her United States citizenship before reaching adulthood is if a guardianship is established for her.* It is illogical that Sonya could enter the United States at the age of eighteen and start receiving SSI payments, but could not receive them any sooner. It is even more illogical that upon reaching eighteen she could qualify for other welfare benefits such as Aid to Families with Dependent Children or General Assistance, but that prior to that time she could not receive an education which would help her to become self-sufficient and less likely to require a "hand-out" of this kind. *See Plyler*, 457 U.S. at 230, 102 S.Ct. at 2401 ("It is difficult to understand precisely what the State hopes to achieve by promoting the creation and perpetuation of a subclass of illiterates within our boundaries...").

CONCLUSION

The Court finds that plaintiffs have demonstrated by a preponderance of the evidence that the decision of the Impartial Hearing Officer was correct, and that Sonya Castro has been an Arizona resident entitled to free educational services since 1984.

Accordingly,

IT IS ORDERED that defendants' Motion to Dismiss is DENIED.

Plaintiffs' request for sanctions in response to said motion is also DENIED.

IT IS FURTHER ORDERED that the decision of the Appeals Hearing Officer in this matter is REVERSED. Declaratory judgment is entered in favor of plaintiffs. Defendants' pendent state counter-claim for out-of-state tuition is DISMISSED with prejudice.

Judgment shall be entered accordingly.